# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MERCY GENERAL HOSPITAL, <u>et al.</u>,                    )
)
        Plaintiffs,                                      )
)
        v.                                                       )      Civil Action No. 16-99 (RBW)
)
ALEX M. AZAR II, in his official capacity          )
as Secretary of the United States                   )
Department of Health and Human Services,    )
)
        Defendant.                                       )
_____ )

## <u>MEMORANDUM OPINION</u>

The plaintiffs, eighty-one acute care hospitals located in California, seek judicial review of the final decision of the defendant, the Secretary of the United States Department of Health and Human Services ("HHS"), denying their claims for reimbursement of deductible and coinsurance payments that were not paid to the hospitals by Medicare beneficiaries.  <u>See</u> Complaint ("Compl.") ¶¶ 1–2.  The parties filed cross-motions for summary judgment, <u>see</u> Plaintiffs' Motion for Summary Judgment; Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, and United States Magistrate Judge Deborah A. Robinson issued a Report and Recommendation (the "Report" or "R&R") recommending that the Court affirm the Secretary's decision, deny the plaintiffs' motion, and grant the Secretary's cross-motion, <u>see</u> R&R at 30.  Currently before the Court are the plaintiffs' Objections to the Magistrate Judge's Report and Recommendation ("Pls.' Objs.").  Upon consideration of the parties' submissions, the parties' arguments presented at the motions hearing

on February 2, 2018, and the administrative record in this case,[1] the Court concludes that it must grant in part and deny in part the plaintiffs' motion for summary judgment, deny the Secretary's cross-motion for summary judgment, and remand this case to the Secretary for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Statutory and Regulatory Framework

### 1. The Medicare Program

The Medicare program, established in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395lll (2012) (the "Medicare Act"), "is a federally funded medical insurance program for the elderly and disabled," Fischer v. United States, 529 U.S. 667, 671 (2000) (internal citation omitted). Relevant here, Part A of the Medicare Act provides insurance coverage to eligible beneficiaries for the cost of inpatient hospital care, home health care, and hospice services, see 42 U.S.C. § 1395c, and Part B provides supplemental coverage for outpatient hospital care and other types of care not covered by Part A, see id. § 1395k. "Although the costs incurred for most of the care provided to Medicare patients are borne by the government, individual Medicare patients are 'often responsible for both deductible and coinsurance payments for hospital care.'" Cmty. Health Sys., Inc. v. Burwell, 113 F. Supp. 3d

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendant's Response to Plaintiffs' Objections to the Magistrate Judge's Report and Recommendation ("Def.'s Objs. Resp."); (2) the plaintiffs' Reply in Support of Objections to the Magistrate Judge's Proposed Findings and Recommendations ("Pls.' Objs. Reply"); (3) the Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pls.' Summ. J. Mem."); (4) the Defendant's Memorandum of Points and Authorities in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Summ. J. Mem."); (5) the Plaintiffs' Reply and Response Brief in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Summ. J. Reply"); (6) the Defendant's Reply in Support of Its Cross-Motion for Summary Judgment ("Def.'s Summ J. Reply"); (7) the plaintiffs' Notice and Clarification; (8) the plaintiffs' Notice of Submission; (9) the Defendant's Response to Plaintiffs' Notice of Submission; (10) the plaintiffs' Written Response to the Court's Queries Pursuant to February 16, 2018 Order ("Pls.' Resp. to Order"); and (11) the Defendant's Response to the Court's Order ("Def.'s Resp. to Order").

197, 203–04 (D.D.C. 2015) (quoting <u>Hennepin Cty. Med. Ctr. v. Shalala</u>, 81 F.3d 743, 745 (8th Cir. 1996)).

The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program on behalf of the Secretary, <u>see</u> <u>Ark. Dep't of Health & Human Servs. v. Ahlborn</u>, 547 U.S. 268, 275 (2006), "through contracts with [M]edicare administrative contractors," 42 U.S.C. §§ 1395h(a), 1395u(a), which were known as "fiscal intermediaries" (the "intermediaries") during the cost years at issue in this case, <u>id.</u> § 1395h (2000). To receive reimbursement from Medicare, providers must submit to their intermediaries "cost reports . . . on an annual basis." 42 C.F.R. § 413.20(b) (2017). The intermediaries then review these reports to determine the amount of reimbursement due to the providers. <u>See</u> 42 U.S.C. § 1395kk-1(a)(4). Following their review, the intermediaries "must . . . furnish the provider . . . a written notice reflecting . . . [their] final determination of the total amount of reimbursement due [to] the provider." 42 C.F.R. § 405.1803(a).

A provider who "is dissatisfied with a final determination of . . . its [ ] intermediary," 42 U.S.C. § 1395oo(a)(1)(A)(i), "may obtain a hearing . . . by a Provider Reimbursement Review Board" (the "Board"), <u>id.</u> § 1395oo(a). "A decision by the Board [must] be based upon the record made at such hearing, . . . and shall be supported by substantial evidence when the record is viewed as a whole." <u>Id.</u> §1395oo(d). The Board's decision is "final unless the Secretary, [via the CMS Administrator (the "Administrator"),] . . . reverses, affirms, or modifies the Board's decision." <u>Id.</u> § 1395oo(f)(1); 42 C.F.R. § 405.1875 (recognizing that the Secretary has delegated to the Administrator his authority to review the Board's decisions). Finally, a provider may "obtain judicial review of any final decision of the Board[] or . . . the [Administrator]." 42

U.S.C. § 1395oo(f)(1); see 42 C.F.R. § 405.1877 ("[A] provider has a right to obtain judicial review of a final decision of the Board, or . . . the Administrator.").

2.      **The Medicaid Program and "Dual Eligibles"**

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396w-5, "authorizes federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons," Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 650 (2003). "In order to participate in the Medicaid program, a [s]tate must have a plan for medical assistance approved by the Secretary," id. (citing 42 U.S.C. § 1396a(b)), which must, among other things, "define[] the categories of individuals eligible for benefits and the specific kinds of medical services that are covered," id. (citing 42 U.S.C. § 1396a(a)(10), (17)).

"Some patients are eligible for both Medicare and Medicaid (known as 'dual eligibles')." Grossmont Hosp. Corp. v. Burwell, 797 F.3d 1079, 1081 (D.C. Cir. 2015). Although "Medicare is the primary payor" in this situation, "[s]tate Medicaid plans often mandate that the state Medicaid agency pay for part or all of the Medicare deductibles and coinsurance amounts incurred in connection with treating these dual eligibles." Id. Claims submitted to a state Medicaid program for these unpaid amounts are often referred to as "crossover claims." Pls.' Summ. J. Mem. at 8.[2] However,

> [i]n some instances, the State has an obligation to pay, but either does not pay anything or pays only a part of the deductible or coinsurance because of a State payment "ceiling." For example, assume that a State pays a maximum of $42.50 per day for [ ] services and the provider's cost is $60.00 a day. The coinsurance is $32.50 a day so that Medicare pays $27.50 ($60.00 less $32.50). In this case, the State limits its payment towards the coinsurance to $15.00 ($42.50 less $27.50).

---

[2] Because the plaintiffs did not insert page numbers on their initiating summary judgment brief, the page numbers cited by the Court when referencing the plaintiffs' brief are the automatically-generated page numbers assigned to the plaintiffs' brief by the Court's ECF system.

CMS Pub. 15-1, § 322.

During the cost years at issue, California participated in Medicaid through a program known as Medi-Cal.  <u>See</u> AR 12.  Effective August 1, 1989, Medi-Cal instituted a payment ceiling for Medicare deductibles and coinsurance for outpatient services.  <u>See</u> AR 606.  Effective May 1, 1994, Medi-Cal instituted a similar ceiling for inpatient services.  <u>See</u> AR 680–83; <u>see also</u> AR 1412, 1422.

### 3.      Medicare "Bad Debts"

If Medicare patients fail to pay the deductible and coinsurance payments that they owe to providers, the providers may seek reimbursement from CMS for these amounts, known as "bad debts."  <u>See</u> 42 C.F.R. § 413.89(e).[3]  To obtain reimbursement for these bad debts, providers must demonstrate that the debt satisfies four criteria:

(1)      The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2)      The provider must be able to establish that reasonable collection efforts were made.

(3)      The debt was actually uncollectible when claimed as worthless.

(4)      Sound business judgment established that there was no likelihood of recovery at any time in the future.

<u>Id.</u>

Chapter 3 of CMS's Provider Reimbursement Manual ("PRM") provides further instruction regarding the requirements for bad debt reimbursement.  As to the second bad debt criterion, regarding "reasonable collection efforts," § 310 provides that "a reasonable collection

---

[3] "Medicare 'reimburses providers for this bad debt' in order to prevent cross-subsidization, <u>i.e.</u>, 'a cost shift from the Medicare recipient to individuals not covered by Medicare.'"  <u>Mountain States Health All. v. Burwell</u>, 128 F. Supp. 3d 195, 199–200 (D.D.C. 2015) (quoting <u>Cmty. Hosp. of Monterey Peninsula v. Thompson</u>, 323 F.3d 782, 786 (9th Cir. 2003)); <u>see also</u> 42 C.F.R. § 413.89(d) ("To assure that [certain] covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs.").

effort . . . must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations." CMS Pub. 15-1, § 310 (hereinafter "PRM"). However, § 312, which addresses bad debts associated with "indigent or medically indigent" patients, provides that "[o]nce indigence is determined and the provider concludes that there ha[s] been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the §[ ]310 procedures." Id. § 312. To determine indigency, § 312 instructs that "[p]roviders can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively." Id. "Otherwise, the provider should apply its customary methods for determining the indigence of patients to the case of the Medicare beneficiary, under [PRM] guidelines[,]" including that "[t]he provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX [(Medicaid)], local welfare agency[,] and guardian[.]" Id.

Finally, § 322 of the PRM provides specific instruction on bad debts associated with dual eligible patients. Id. § 322. It provides that

> [w]here the State is obligated either by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. [However, a]ny portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of §[ ]312 or, if applicable, §[ ]310 are met.

Id. Additionally, § 322 addresses situations in which "the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment 'ceiling.'" Id. Section 322 instructs that, "[i]n these situations, any portion of the

deductible or coinsurance that the State does not pay that remains unpaid by the patient[] can be included as a bad debt under Medicare, provided that the requirements of §[ ]312 are met." Id.

### 4. The "Bad Debt Moratorium"

"In 1986, the [I]nspector [G]eneral of [HHS] had proposed either eliminating bad debt reimbursement entirely or attempting to recoup the costs by garnishing the Social Security checks of debtors." Hennepin Cty. Med. Ctr., 81 F.3d at 747. Although "[n]either proposal was adopted[,] [t]he [I]nspector [G]eneral then called for much closer examination of providers' bad debt requests." Id. "On August 1, 1987, in an attempt to shield Medicare providers from the Inspector General's proposed policy changes, Congress enacted [legislation that] became known as the Bad Debt Moratorium." Foothill Hosp.—Morris L. Johnston Mem'l v. Leavitt, 558 F. Supp. 2d 1, 3 (D.D.C. 2008); see also Hennepin Cty. Med. Ctr., 81 F.3d at 750–51 ("In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the [I]nspector [G]eneral's proposed changes in the criteria for bad debt reimbursement."). The legislation, which amended the Medicare Act, sought to "'freeze' the Secretary's Medicare bad debt reimbursement policies." Mountain States Health All. v. Burwell, 128 F. Supp. 3d 195, 200 (D.D.C. 2015). Specifically, it provided that

> [i]n making payments to hospitals under [the Medicare program], the Secretary . . . shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including criteria for what constitutes a reasonable collection effort).

Omnibus Budget Reconciliation Act (OBRA) of 1987, Pub. L. No. 100–203, § 4008(c), 101 Stat. 1330, 1330–55 (codified at 42 U.S.C. § 1395f note).

Following the legislation's enactment, "the [I]nspector [G]eneral continued to urge closer scrutiny of bad debt requests." Hennepin Cty. Med. Ctr., 81 F.3d at 747. Thus, in 1988,

Congress amended the Medicare Act a second time to clarify that criteria for what constitutes a "reasonable collection effort . . . includ[ed] criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency." Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, § 8402, 102 Stat. 3342, 3798 (codified at 42 U.S.C. § 1395f note). The amendment's legislative history makes clear that the amendment was intended to address Congress's "concern[s] about recommendations made by the Inspector General . . . subsequent to August 1, 1987, . . . [that] appear[ed] to create requirements in addition to those in the Secretary's regulations, the decisions of the . . . Board, and relevant program manual and issuances." HR Conf. Rep. No. 100–1104 (1988), as reprinted in 1988 U.S.C.C.A.N. 5048, 5337. However, the amendment was "not intend[ed] to preclude the Secretary from disallowing bad debt payments based on regulations, [Board] decisions, manuals, and issuance[s] [ ] in effect prior to August 1, 1987." Id.[4] The Bad Debt Moratorium ended on October 1, 2012. See Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112–96, tit. III, § 3201(d), 126 Stat. 156, 192–93 (codified at 42 U.S.C. § 1395f note).

**5.      PRM § 1102.3L and JSM-370**

In November 1995, CMS revised its guidance in the PRM regarding reimbursement of bad debts associated with dual eligibles. Specifically, it revised § 1102.3L to read as follows:

> Evidence of the bad debt arising from Medicare/Medicaid crossovers may include a copy of the Medicaid remittance showing the crossover claim and resulting Medicaid payment or nonpayment. However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt

---

[4] In 1989, Congress amended the Medicare Act a third time. See Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, § 6023, 103 Stat. 2167 (codified at 42 U.S.C. § 1395f note). However, this amendment is not at issue in this case. See Pls.' Resp. to Order at 18 ("The plaintiffs rely on the Bad Debt Moratorium as enacted in . . . 1987, and not on the 1989 amendment." (internal citation omitted)).

where the provider can establish that Medicaid is not responsible for payment. In lieu of billing the Medicaid program, the provider must furnish documentation of:

- Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and

- Non-payment that would have occurred if the crossover claim had actually been filed with Medicaid.

The payment calculation will be audited based on the state's Medicaid plan in effect on the date that services were furnished.

AR 1248–49.

However, on August 10, 2004, CMS issued a memorandum, known as JSM-370, which "changed the language in . . . [§] 1102.3L to revert back to pre-1995 language, which requires providers to bill the individual states for dual eligibles' co-[insurance] and deductibles before claiming Medicare bad debt." AR 1608. According to this memorandum, CMS changed § 1102.3L's language "[a]s a result of [a] Ninth Circuit decision," which had "found [§] 1102.3L to be inconsistent with the Secretary's must[-]bill policy." AR 1607–08 (citing Cmty. Hosp. of the Monterey Peninsula v. Thompson, 323 F.3d 782 (9th Cir. 2003)). The memorandum further explained that the Secretary's "must[-]bill" policy provides that "where the state owes none or only a portion of [a] dual[]eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State[] and the State refuses payment (with a State Remittance Advice)." AR 1607. Finally, the memorandum includes a "directive to hold harmless providers that can demonstrate that they followed the instructions previously laid out at [§] 1102.3L[] for open cost reporting periods beginning prior to January 1, 2004." AR 1608. Specifically, CMS noted that "[i]ntermediaries who followed the now-obsolete [§] 1102.3L instructions for cost reporting periods prior to January 1, 2004[,] may reimburse providers they service for dual-eligible bad debts with respect to unsettled cost reports that were deemed allowable using other documentation in lieu of billing the state." AR 1608.

**B.      Factual Background**

As noted earlier, the plaintiffs are acute care hospitals located in California that participate in both Medicare and Medi-Cal.  See AR 12.  At issue in this case are the plaintiffs' claims for Medicare reimbursement of unpaid deductible and coinsurance amounts associated with dual eligible patients, incurred between the fiscal years ending in October 1995 and December 2004.  See AR 2–3.[5]  During these fiscal years, the plaintiffs "billed [Medi-Cal] for some of the dual eligible patients but due to various factors related to the billing process they decided[] . . . to stop billing, alleging that it was not cost effective" for them to bill Medi-Cal. AR 12 n.13.  Among the problems they encountered were that "Medi-Cal [ ] failed to issue remittance advices in some instances and also[,] . . . as a result of [Medi-Cal's] payment ceiling, the Medi-Cal payments were often zero or only a dollar or two."  AR 12.  According to the plaintiffs, beginning "in 1992 and [ ] continu[ing] . . . in 1995," they "gathered alternative documentation and submitted bad debt lists for billed and unbilled cross[]over claims . . . for audit verification."  Pls.' Objs. at 19.  Additionally, "the [plaintiffs] contracted in 2007[] . . . with" EDS Corporation ("EDS"), which they claim is "the same contractor used by . . . California" to process crossover claims, "to produce reports to submit . . . [to the intermediary] as [ ] alternative documentation to the State remittance advices" (the "EDS reports").  AR 12–13; see also AR 34 (explaining that the plaintiffs retained EDS "in order to . . . generate certain reports 'for the purposes of identifying outpatient and inpatient bad debt payable by the Medicare program'").

The plaintiffs' intermediary ultimately "disallowed the . . . amounts" claimed by the plaintiffs because "there were no State Medicaid remittance advices," AR 12, i.e., a "receipt" for

---

[5] According to the plaintiffs, the claims sought represent a monetary value of approximately $55 million.  See AR 121.

payment or non-payment, Motions Hrg. Tr. 5:9 (Feb. 2, 2018). Thereafter, the plaintiffs

appealed the intermediary's determination to the Board, which held a hearing on the plaintiffs'

claims on August 23 and 24, 2012. See AR 31–32. On September 14, 2015, the Board issued a

decision affirming the intermediary's disallowance of the plaintiffs' claims, see AR 39, which

the plaintiffs then appealed to the Administrator, see AR 2.

On November 12, 2015, the Administrator issued a decision affirming the Board's

decision. AR 19. The Administrator concluded:

> [R]egardless of any alleged omissions by the State to provide the Medicaid
> remittance advices and the payment ceiling, or the alleged financial inconvenience
> [to the plaintiffs], the [plaintiffs] were required to bill for and produce [ ] remittance
> advices as a condition of including crossover bad debt claims on [their] cost
> report[s]. Accordingly, the[ir] failure to produce Medicaid remittance advices
> represent[ed] a failure on the part of the [p]roviders to meet the necessary criteria
> for Medicare payment of bad debts related to these claims and the [intermediary]
> was correct to deny the crossover bad debt claims for the cost years at issue.

AR 13. Additionally, regarding the "require[ment] to bill for and produce [ ] remittance

advices," AR 13, referred to collectively by the Administrator as the Secretary's "must-bill

policy," the Administrator found:

> [T]he [B]ad [D]ebt [M]oratorium d[id] not prohibit the disallowances in this
> case . . . [because t]he must-bill policy [ ] has been in effect since before August 1,
> 1987, as is evidenced in numerous Administrator and Board decisions[,] . . . the
> longstanding PRM sections 310[,] [ ] 312[,] and 322, . . . [and] the longstanding
> regulations and [Medicare] statute[, which] require showing a debt is worthless as
> claimed and that reasonable collection efforts have been met[,] and . . . maintaining
> [ ] contemporaneous documentation to support a claim.

AR 15. The Administrator further found that "any relief CMS grants based on a [p]rovider's

reliance on [PRM §] 1102.3L is set forth under [the] criteria of the JSM[-370] 'hold harmless'

policy," and that the plaintiffs did not qualify for such relief because they "d[id] not show that in

[the] past years the [plaintiffs] had claimed and [ ] the [intermediary] had[ ] . . . allowed payment

under [§] 1102.3L." AR 17. Alternatively, the Administrator found that "[§] 1102.3L . . .

require[s] documentation reflecting 'data available from [a provider's] basic accounts, as usually maintained,'" AR 16 (quoting 42 C.F.R. § 413.26(a)), and "the [plaintiffs] ha[d] not maintained 'contemporaneous documentation in the ordinary course of business to support their claims[,]' which in fact[] the State remittance advices represent," AR 16–17. Finally, the Administrator rejected "the [plaintiffs'] contentions that the EDS reports qualif[ied] as remittance advices . . . [because] the EDS reports [we]re not contemporaneously generated State documents[] . . . [and] were not validated, certified[,] or adopted as State documents." AR 18.

On January 19, 2016, the plaintiffs filed this action seeking judicial review of the Administrator's decision. See Compl. at 1.[6] Thereafter, the parties filed their cross-motions for summary judgment, which the Court referred to a magistrate judge for a report and recommendation. See Order at 1 (Jan. 20, 2016). On August 18, 2017, Magistrate Judge Robinson issued her Report and Recommendation, which recommended that the Court affirm the Administrator's decision, deny the plaintiffs' motion for summary judgment, and grant the Secretary's cross-motion for summary judgment. See R&R at 30. The Magistrate Judge specifically concluded that because "three provisions of the PRM [that] form the Secretary's must-bill policy . . . were in place prior to [ ] 1987[,] . . . the must-bill policy does not violate the Moratorium." Id. at 15. Additionally, she found that the must-bill policy was "further identified" in a 1985 CMS Medicare Intermediary Manual (the "1985 Intermediary Manual") and also "consistently applied in several administrative decisions." Id. at 18. The Magistrate Judge further concluded that the Administrator's "application of the must-bill policy to both

---

[6] Section 1395oo(f) of the Medicare Act requires a provider to seek judicial review of the Administrator's decision "within [sixty] days of the date on which notice of any final decision . . . is received." 42 U.S.C. § 1395oo(f). Although the plaintiffs did not file their complaint in this case until January 19, 2016, see Compl. at 1, more than sixty days after the Administrator issued his decision on November 12, 2015, see AR 19, the Secretary admitted the plaintiffs' factual allegation that "th[e] [c]omplaint [wa]s filed within [sixty] days of receipt of the final decision of the Secretary [ ] denying reimbursement for the bad debts," Compl. ¶ 171; see Answer ¶ 171. Thus, this admitted allegation establishes that the plaintiffs' action is timely under § 1395oo(f).

ceiling and non-ceiling cases [wa]s not plainly erroneous or inconsistent with the regulations," and thus, not arbitrary and capricious. Id. at 16. Finally, the Magistrate Judge concluded that the Administrator's "rejection of the [plaintiffs'] EDS reports . . . was not arbitrary and capricious or an abuse of discretion." Id. at 30.[7]

## II.     STANDARDS OF REVIEW

### A.     Objections to Report and Recommendation

Federal Rule of Civil Procedure 72(b) governs the Court's resolution of objections to a magistrate judge's report and recommendation on dispositive motions. The Rule provides that "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). Accordingly, "only those issues that the parties have raised in their objections to the Magistrate Judge's report [and recommendation] will be reviewed by th[e] court. . . . [Thus], objecting to only certain portions of the Magistrate Judge's report 'does not preserve all the objections one may have.'" Aikens v. Shalala, 956 F. Supp. 14, 19–20 (D.D.C. 1997) (citations omitted). Upon completing a review of the parties' objections, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

### B.     Summary Judgment in Agency Review Cases Under Rule 56(a)

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[7] The Magistrate Judge additionally concluded "that the [plaintiffs] are unable to estop the Secretary from denying their request for bad debt reimbursement based on their purported reliance on either the statements of CMS officials or § 1102.3L of the PRM." R&R at 27. However, because the plaintiffs represent that they "are not making a detrimental reliance argument in this case," Pls.' Objs. at 18, the Court need not address the Magistrate Judge's conclusion concerning this point.

law." Fed. R. Civ. P. 56(a).  However, because this Court must review the final decisions of the

Secretary under the applicable provisions of the Administrative Procedure Act ("APA"), see 42

U.S.C. § 1395oo(f)(1) (incorporating the "applicable provisions under chapter 7 of Title 5 [of the

United States Code]"), the typical summary judgment standards set forth in Federal Rule of Civil

Procedure 56 are not applicable, see Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203,

207 (D.D.C. 2007), aff'd, 408 F. App'x 383 (D.C. Cir. 2010).  "Under the APA, it is the role of

the agency to resolve factual issues to arrive at a decision that is supported by the administrative

record, whereas 'the function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did.'"

Id. (quoting Occidental Eng'g Co. v. Immigration Naturalization Serv., 753 F.2d 766, 769–70

(9th Cir. 1985)).  In other words, "when a party seeks review of agency action under the APA,

the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of

law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and

citations omitted).

     The APA requires courts to "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  However, "[t]he scope of review under the

'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that

of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983).  Nonetheless, "the agency must examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"  Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

However, "[c]ourts 'will uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned.'" Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

An agency's factual findings must be "supported by substantial evidence on the record as a whole." Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).[8] "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." Fla. Gas Transmission Co. v. Fed. Energy Regulatory Comm'n, 604 F.3d 636, 645 (D.C. Cir. 2010) (quoting FPL Energy Me. Hydro LLC v. Fed. Energy Regulatory Comm'n, 287 F.3d 1151, 1160 (D.C. Cir. 2002)). Put differently, it "is the amount of evidence constituting 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact for the jury.'" Kay v. FCC, 396 F.3d 1184, 1188 (D.C. Cir. 2005) (quoting Ill. Cent. R.R. v. Norfolk & W. Ry., 385 U.S. 57, 66 (1966)). In determining whether an agency's factual finding is supported by substantial evidence, "weighing the evidence is not the court's function," United Steel Workers v. Pension Ben. Guar. Corp., 707 F.3d 319, 325 (D.C. Cir. 2013), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Ultimately, the substantial evidence standard is "highly deferential," and "requir[es] only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rossello ex rel. Rossello v. Astrue, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting

---

[8] Although the APA's substantial evidence standard purports only to apply to notice-and-comment rulemaking and formal adjudications, see 5 U.S.C. § 706(2)(E), this Circuit has held that an agency's decision in an informal adjudication "still must be supported by substantial evidence—otherwise it would be arbitrary and capricious," Safe Extensions v. Fed. Aviation Admin., 509 F.3d 593, 604 (D.C. Cir. 2007); see also Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C. Cir. 1984) ("[I]t is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.")

Pierce v. Underwood, 487 U.S. 552, 565 (1988)); see also Robinson v. Nat'l Transp. Safety Bd.,

28 F.3d 210, 215 (D.C. Cir. 1994) (under the substantial evidence standard, "[t]he court's

function is to determine only whether the agency . . . could fairly and reasonably find the facts

that it did" (internal citations and quotation marks omitted)).

### III.      ANALYSIS

As already explained, the Administrator denied the plaintiffs' claims for Medicare

reimbursement of unpaid deductibles and coinsurance pursuant to the Secretary's "must-bill

policy," AR 15, which requires providers seeking Medicare reimbursement for bad debts

associated with dual eligibles to (1) bill the state Medicaid program (the "billing requirement")

and (2) obtain and submit to the intermediary a remittance advice from the state Medicaid

program (the "remittance advice requirement"), see AR 13 (explaining that the must-bill policy

"require[s] [providers] to bill for and produce remittance advices as a condition of including

crossover bad debt claims on [their] cost report[s]").[9]  The Administrator denied the plaintiffs'

claims for failing to satisfy the remittance advice requirement.  See AR 13 ("[T]he [plaintiffs']

failure to produce the Medicaid remittance advices represent[ed] a failure . . . to meet the

necessary criteria for Medicare payment of bad debts[,] . . . [and] the [intermediary] was correct

to deny the [plaintiffs'] crossover bad debt claims[.]").  In opposition to this conclusion, the

plaintiffs argue that (1) "[t]he Secretary's purported must-bill policy . . . was not in place prior to

August 1, 1987, and therefore violates the Moratorium," Pls.' Objs. at 3, or, alternatively, even if

the must-bill policy is lawful: (2) "the Secretary should be ordered to accept the alternative

documentation the [p]laintiffs submitted" under "PRM [§] 1102.3L, which clearly provided that

---

[9] The Court notes that the Administrator's description of the must-bill policy as having two components is consistent
with the Secretary's description of the policy expressed in Grossmont Hospital Corp.  See 797 F.3d at 1082
(describing the Secretary's policy as requiring a hospital to "bill[] the state Medicaid agency ('must[-]bill policy')
and obtain[] a determination from the state of its payment responsibility ('mandatory state determination')").

providers could submit proper alternative documentation in lieu of billing the State[] . . . and which was applicable to the [p]laintiffs' cost years at issue," id. at 17; and (3) the plaintiffs' "EDS [reports] were the equivalent of remittance advices from the State, and[, therefore,] rejecting them was improper," id. at 24. For the reasons explained below, because the Court concludes that the Administrator erred by finding that a remittance advice requirement existed prior to August 1, 1987, and thus, did not violate the Moratorium, the Court must remand this case to the Secretary for further proceedings without addressing the plaintiffs' remaining arguments.

## A.      The Alleged Violation of the Bad Debt Moratorium

The Administrator concluded that the Secretary's must-bill policy did not violate the Bad Debt Moratorium based on his finding that the "policy [ ] ha[d] been in effect since before August 1, 1987, as is evidenced in numerous Administrator and Board decisions, . . . the longstanding PRM sections 310 and 312 and 322, . . . [and] the longstanding regulations and statute." AR 16. The Magistrate Judge agreed with the Administrator's conclusion, specifically "find[ing] that the must-bill policy was established through the three cited portions of the PRM, was further identified in the [1985 Intermediary Manual], and was consistently applied in several administrative decisions." R&R at 18. The plaintiffs object to the Magistrate Judge's finding that a must-bill policy existed prior to the Moratorium on numerous grounds. Specifically, they argue that the Magistrate Judge (1) "applied the wrong standard and misconstrued [the p]laintiffs' [action] as one challenging whether the must[-]bill policy is reasonable," Pls.' Objs. at 3; (2) "erred by finding [that] the PRM provisions established the must[-]bill policy because those provisions do not by their plain terms establish the must[-]bill policy, nor is there substantial evidence to support the position that the Secretary interpreted them as establishing

such a policy before the Moratorium," id. at 12; (3) "misapplied administrative decisions, correctly noting that they are incapable of setting policy but incorrectly construing them as evidence of the existence of the must[-]bill policy," id. at 15; (4) "improperly considered a 1985 . . . Intermediary Manual [ ] provision . . . that [ ] is not part of the [a]dministrative [r]ecord in this case," id. at 13; and (5) erred by "not giv[ing] any weight to the unchallenged testimony at the [Board hearing] that senior officials at CMS were emphatic that no must[-]bill policy existed prior to the Moratorium," id. at 16.

As an initial matter, the Court notes that so far as it is aware, the issue of whether the Secretary's must-bill policy violates the Moratorium has not been decided by any other court. Although a number of courts, including this Circuit, have addressed whether the Secretary's must-bill policy is owed judicial deference, see, e.g., Grossmont Hosp. Corp., 797 F.3d at 1086 (deferring to the Secretary's interpretation of its regulations because "[t]here [wa]s no indication that the Secretary's interpretation is contrary to law or to the agency's intent at the time of the adoption"), none has specifically addressed whether the must-bill policy constitutes a change in policy in violation of the Moratorium, see, e.g., id. at 1084 (finding that the plaintiff "failed to preserve its challenge that the mandatory state determination policy violates the . . . [M]oratorium"). Thus, despite the Secretary's insistence that the Administrator's decision "must be affirmed because it is settled law, in this [C]ircuit and others, that the must-bill policy is valid," Def.'s Summ. J. Mem. at 14 (relying on Grossmont Hospital Corp. and other similar cases), none of the cases cited by the Secretary directly addresses the issue currently before the Court.

In its analysis of the issue, the Court will first address the plaintiffs' argument regarding the proper standard for the Court's review of the Administrator's finding that the Secretary's

must-bill policy existed prior to the Moratorium. Next, because the Administrator relied only on the remittance advice requirement of the must-bill policy as the basis for rejecting the plaintiffs' claims, <u>see</u> AR 12, the Court's Moratorium analysis addresses the remittance advice requirement first.

### 1. The Proper Standard of Review

The plaintiffs assert that the Magistrate Judge "applied the wrong standard" in reviewing the "Administrator's conclusion that the must[-]bill policy did not violate the Moratorium." Pls.' Objs. at 3. Specifically, they argue that the Magistrate Judge's finding—"that the [Secretary's] application of the must[-]bill policy is not 'plainly erroneous or inconsistent' with the regulations," <u>id.</u> at 5 (quoting R&R at 16)—"invokes the familiar test of whether deference is due to an agency's interpretation of its regulations," <u>id.</u> at 6, and thus, "makes it . . . apparent that the Report looked at the Moratorium issue from the perspective of whether the Secretary's must[-]bill policy is a reasonable interpretation of the regulations [to which the Court must defer], . . . [rather than] from the (correct) perspective of whether[] . . . [the Secretary's] factual finding[] . . . [that] the must[-]bill policy existed prior to the Moratorium[] . . . [was] '[]supported by substantial evidence,'" <u>id.</u> (quoting <u>Dist. Hosp. Partners, L.P. v. Sebelius</u>, 932 F. Supp. 2d 194, 199 (D.D.C. 2013)). They further argue that the Magistrate Judge's "citation to cases like <u>Cove Associates Joint Venture v. Sebelius</u> underscore[s] . . . that the Report . . . applied the wrong legal standard" because "[i]n [those cases], the Court did <u>not</u> find that the PRM provisions established the must[-]bill policy; rather, the Court deferred to the Secretary's interpretation that those 'ambiguous' [ ] provisions could reasonably be interpreted as establishing the must[-]bill policy." <u>Id.</u> at 9–10 n.7 (citing 848 F. Supp. 2d 13, 25 (D.D.C. 2012)). The Secretary does not directly respond to this argument, but generally asserts that "the Magistrate Judge [c]orrectly

[c]oncluded [t]hat the [m]ust [b]ill [p]olicy [p]redated the Bad Debt Moratorium." Def.'s Objs. Resp. at 2.

The Court agrees with the plaintiffs that the Administrator's finding that the must-bill policy existed prior to August 1, 1987, is a factual one, and as such, the Court must review it under the substantial evidence standard. See Dist. Hosp. Partners, 932 F. Supp. 2d at 200 (reviewing the Administrator's finding that the challenged policy predated the Bad Debt Moratorium under the substantial evidence standard); see also Cmty. Health Sys., Inc., 113 F. Supp. 3d at 220 (same); Lakeland Reg'l Health Sys. v. Sebelius, 958 F. Supp. 2d 1, 7 (D.D.C. 2013) (same). However, the Court cannot agree with the plaintiffs that it is "apparent" that the Magistrate Judge did not apply this standard. Pls.' Objs. at 6. Although the Magistrate Judge did not explicitly purport to apply the substantial evidence standard in reviewing the Administrator's finding, see generally R&R at 9–18 (not referencing the substantial evidence standard), her analysis is consistent with the application of that standard of review, as she analyzed evidence cited by the Administrator to determine whether it supported the Administrator's finding, see id. at 18 (concluding that "the must-bill policy was established through the three cited portions of the PRM, was further identified in the [1985 Intermediary Manual], and was consistently applied in several administrative decisions"). And, her citation to decisions holding that the must-bill policy is a reasonable interpretation of the bad debt regulations and the PRM provisions as support for her conclusion that "the [relevant] provisions of the PRM[] . . . establish [the billing] requirement," id. at 14–15, appears to have been used only to bolster her independent analysis of the text of the PRM provisions, see id. at 13–15 (analyzing the PRM provisions and concluding that they "form the Secretary's must-bill policy"). Moreover, the Magistrate Judge's conclusion that "the Secretary's application of the

must-bill policy . . . is not plainly erroneous or inconsistent with the regulations," R&R at 16, does not demonstrate that the Magistrate Judge "engaged in the wrong analysis," Pls.' Objs. at 5. Notably, the Magistrate Judge's conclusion was reached in a section of the Report addressing "whether the Secretary's interpretation of the must-bill policy—i.e., that i[t] applies to both ceiling and non-ceiling cases alike—is arbitrary and capricious," R&R at 15–16, and did not purport to relate to the Magistrate Judge's preceding analysis of whether the Administrator properly concluded that the must-bill policy existed prior to the Moratorium, see id. at 9–15. Thus, although, for the reasons explained below, the Court reaches a different conclusion than the Magistrate Judge based on its own de novo assessment of the evidence cited by the Administrator, the Court declines to reject the Magistrate Judge's report and recommendation on the ground that she applied an incorrect standard of review.

### 2.     Chapter 3 of the PRM

The Administrator concluded that sections 310, 312, and 322 of the PRM, "read[] . . . together," demonstrate that "in situations where a State is liable for all or a portion of the deductible and coinsurance amounts, the State . . . is to be billed and a remittance advice[] issued" "as a prerequisite of payment of the claim by Medicare as a bad debt." AR 14. The Magistrate Judge also concluded that "PRM [§§ 310, 312, and 322], taken together, establish a requirement that providers bill state Medicaid programs for dually eligible beneficiaries," and because these "provisions were in place prior to the . . . Moratorium, . . . the must-bill policy does not violate the Moratorium." R&R at 15. The plaintiffs object to the Magistrate Judge's conclusion, arguing that "although the [Report] may offer a plausible reading of the PRM, the Report's reading is in no way compelled by the plain language of the PRM," and thus, these PRM provisions do not support "the Administrator['s] [conclusion] that the Secretary's . . .

must[-]bill policy pre-dated the Moratorium." Pls.' Objs. at 7. The Secretary responds that the Magistrate Judge properly concluded that the PRM provisions "establish a requirement that providers bill State Medicaid programs for dually eligible beneficiaries." Def.'s Objs. Resp. at 3 (quoting R&R at 15). For the reasons explained below, the Court agrees with the plaintiffs that the plain language of the cited PRM provisions does not impose a remittance advice requirement.

As previously referenced, § 310 of the PRM, which addresses the "reasonable collection efforts" requirement for bad debt reimbursement under 42 C.F.R. § 413.89(e), provides that "a reasonable collection effort . . . must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations." PRM § 310. Additionally, it provides that "[t]he provider's collection effort should be documented in the patient's file by copies of the bill(s), follow-up letters, reports of telephone and personal contact, etc." Id. § 310.B. Section 312, however, creates an exception to PRM § 310 for bad debts associated with "indigent or medically indigent" patients. Id. § 312. Specifically, it provides that "[o]nce indigence is determined and the provider concludes that there ha[s] been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 procedures." Id. (emphasis added). It further provides that to determine indigence, "[p]roviders can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively." Id. "Otherwise, the provider should apply its customary methods for determining the indigence of patients to the case of the Medicare beneficiary, under [PRM] guidelines," including that "[t]he provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., [Medicaid], local welfare agency[,] and guardian." Id.

Finally, § 322 provides instruction on bad debts associated with dual eligible patients in particular. Id. § 322. It provides:

> Where the State is obligated either by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of §[ ]312 or, if applicable, §[ ]310 are met.

Id. Additionally, in situations in which "the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment 'ceiling,'" § 322 instructs that "any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, can be included as a bad debt under Medicare, provided that the requirements of §[ ]312 are met." Id.

Regarding these three sections of the PRM, the Administrator concluded:

> Section 310 of the PRM generally requires a provider to issue a bill to the party responsible for the beneficiaries' payment. Section 312 of the PRM, while allowing a provider to deem a dually eligible patient indigent and claim the associated debt, first requires that no other party, including the State Medicaid program is responsible for payment. Section 322 of the PRM addresses the circumstances of dually eligible patients where there is a State payment ceiling. That section states that the 'amount that the State does not pay' may be reimbursed as a Medicare bad debt. . . . Reading the sections together, the Administrator concludes that, in situations where a State is liable for all or a portion of the deductible and coinsurance amounts, the State is the responsible party and is to be billed and a remittance advice[] issued in order to establish the amount of bad debts owed under Medicare.

AR 13–14. The Magistrate Judge, although reaching the same conclusion that these provisions established the must-bill policy, see R&R at 15, adopted a slightly different interpretation of these sections. Specifically, she concluded that § 312 does not "render[] the entirety of § 310 inapplicable to dually-eligible beneficiaries," but instead only "contemplate[s] that the strict requirements of § 310 need not apply to the issuance of a bill to the beneficiary, when the provider has determined that the beneficiary is indigent." Id. at 14. Moreover, she concluded

that § 310, "read in conjunction with § 312, [makes it] apparent that the regulations require providers to submit bills to other [non-patient] sources," citing § 312's language that a "provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., [Medicaid]." Id. (quoting PRM § 312.C). She further noted that notwithstanding any language in the PRM, "the provider must comply with 42 C.F.R. §413.89(e), which requires that the provider make 'reasonable collection efforts.'" Id. Additionally, she concluded that § 322 provided further support for the applicability of §§ 310 and 312 to the providers in this case, as it "provides that any deductible and coinsurance amounts that are not paid by the state Medicaid program are 'allowable bad debts provided that the requirements of §[ ]312, or if applicable, §[ ]310 are met." Id. (quoting PRM § 322).

Although the plaintiffs "take no issue with [] PRM[] [§ 310's] requirement that the provider must generally bill the responsible party before claiming unpaid coinsurance and deductibles as bad debt[s]," they do "take issue with the Secretary's interpretation of the PRM sections as requiring providers to bill the State in order to determine whether or to what extent the State is the responsible party." Pls.' Objs. at 8. They argue that although § 312 requires the "provider [to] determine[] that no other party, including the state Medicaid program, is responsible for payment," Pls.' Objs. at 7, "[n]owhere does the PRM say that the only way a provider can determine the State is not responsible for payment is by billing the State," id. at 8. And they point out that, "[i]ndeed, as recognized by the Secretary himself, there are other ways to determine whether and the extent to which the State is responsible for payment," id. at 8–9, and "[t]he mere fact that [§] 3[1]2 of the PRM use[s] the language[,] '[t]he provider must determine[,]' indicates that the provider is able to make the determination of the State's liability on its own, albeit through information that is subject to verification," Pls.' Summ. J. Mem. at 29

n.13.  They further argue that § 322 "does not impos[e] a requirement that the State must be billed," which is significant because it "contains an example that specifically contemplates ceiling cases like those at issue in this case."  Pls.' Objs. at 7.  Finally, they argue that "it is not enough that the Secretary can, for the first time after 1987, point to language in guidance and interpret that guidance as supporting the [must-bill] policy," because "even though th[e] PRM provisions did predate the Moratorium[,] . . . the Secretary's interpretation [of them] in this case did not predate the Moratorium as a factual matter."  Id. at 12.

Upon review of these PRM provisions, the Court agrees with the plaintiffs that they do not establish a remittance advice requirement or otherwise support that one existed prior to the Moratorium.  Although it is undisputed that these provisions existed prior to the Moratorium, "that fact does not end the inquiry."  Winder HMA LLC v. Burwell, 206 F. Supp. 3d 22, 37 (D.D.C. 2016).  Rather, "[t]he question facing the Court[] [ ] is whether the Secretary's current understanding of . . . th[e] [provisions] is consistent with the agency's understanding of th[em] . . . in 1987."  Id.; see also Foothill Hosp., 558 F. Supp. 2d at 10 (rejecting the Secretary's argument that "the [bad debt] regulation . . . provide[d] sufficient support for [his] decision" because the Secretary "[wa]s confusing the regulation with his agency's interpretations of th[e] regulation. While [the regulation] certainly predate[d] the Moratorium, [his] current interpretation of [it] . . . d[id] not.").

The Court cannot conclude that the plain language of these three PRM provisions establishes a remittance advice requirement.  Notably, although the Administrator claims that these provisions "plainly require[] that the provider bill the State as a prerequisite of payment of the claim by Medicare as a bad debt," he does not make any such claim as to a remittance advice requirement, only asserting that such a requirement arises from "[r]eading the[se] sections

together." AR 14. Beginning with § 310, although the Court agrees with the Administrator that the plain language of this provision "generally requires a provider to issue a bill to the party responsible for the beneficiaries' payment," AR 13, that section makes no reference to a remittance advice or any other documentation of a response from the state, see PRM § 310. Indeed, the portion of § 310 specifically addressing "[d]ocumentation required" only addresses "copies of bills" and does not refer to any documentation from the state. Id. § 310.B. In any event, § 310 appears to be inapplicable here because § 312, read literally, exempts providers from complying with that section when seeking reimbursement for dual eligible patients. See id. § 312 (stating that a "[p]rovider[] can deem Medicare beneficiaries indigent . . . when such individuals have also been determined eligible for Medicaid," and "[o]nce indigence is determined and the provider concludes that there ha[s] been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 procedures" (emphasis added)).[10] Therefore, § 310 alone does not establish a remittance advice requirement.

Additionally, the Court cannot conclude that language in § 312.C establishes a remittance advice requirement either. First, although not raised by the plaintiffs, the plain language of § 312 renders § 312.C "literally inapplicable to Medicaid patients." Cmty. Hosp. of Monterey Peninsula, 323 F.3d at 795. As already explained, § 312 provides that a "[p]rovider[] can deem

---

[10] The Magistrate Judge's interpretation of § 312—that it only exempts a provider from "the issuance of a bill to the beneficiary," R&R at 14—may be reasonable, but it is not evident from the plain language of the provision. And in any event, to the extent that the Secretary adopts that interpretation in this litigation, see Def.'s Summ. J. Mem. at 18 ("Under Section 312 of the manual, if a provider determines that a patient is 'indigent,' then it need not seek payment from the patient using the Section 310 procedures[.]" (emphasis added)), because the Administrator did not interpret § 312 this way, see AR 13–14, that position constitutes a post-hoc rationalization that cannot support the Administrator's decision, see Summer Hill Nursing Home LLC v. Johnson, 603 F. Supp. 2d 35, 39 (D.D.C. 2009) (rejecting the Secretary's position in litigation because "[n]owhere in the Secretary's decision is that rationale articulated, and the Court cannot accept the lawyers' post hoc rationalization").

Medicare beneficiaries indigent . . . when such individuals have also been determined eligible for Medicaid . . . . Otherwise, the provider should apply its customary methods for determining the indigence of patients . . . under [certain] guidelines," PRM § 312 (emphasis added), which include that "[t]he provider must determine that no source other than the patient would be legally responsible for the patient's medical bill, e.g., [Medicaid]," id. § 312.C (emphasis added).[11] Even assuming that § 312.C applies to all indigent patients, as the plaintiffs contend, that section nowhere states that a provider must receive a remittance advice from a state Medicaid program in order to "determine that no source other than the patient would be legally responsible for the patient's medical bill," id. § 312.C, and indeed, it does not establish any requirements for how a provider must make this determination, see id. Moreover, although the Administrator concluded that "[i]t is only through the State's records and claims system that the amount of any payment can be determined," AR 13; see also AR 8 ("The State maintains the most accurate patient information to make the determination of a patient's Medicaid eligibility status at the time of service and thus, to determine the State's cost sharing liability for unpaid Medicare deductibles and coinsurance."), as the plaintiffs point out, the Administrator's conclusion is undermined by the fact that CMS previously "recognized that there [a]re alternative methods for determining the State's responsibility for bad debts in ceiling cases" when it "promulgated section 1102.3L[] in November 1995," which provided that "in lieu of billing the State, . . . [a] provider '[may] establish that Medicaid is not responsible for payment' by 'furnish[ing] documentation of . . . [n]on payment that would have occurred if the crossover claim had actually been filed with

---

[11] Although it may be "difficult to understand why . . . [the Medicare] program would insist on a provider pursuing those secondarily liable in cases where the patient is 'determined' to be indigent, and not so insisting where the patient is 'deemed' to be indigent because he or she qualifies for Medicaid," Cmty. Hosp. of Monterey Peninsula, 323 F.3d at 795, it remains that the plain language of § 312 does not require providers to comply with § 312.C once they have deemed a patient indigent based on the patient's Medicaid eligibility.

Medicaid,'" Pls.' Summ. J. Mem. at 30 & n.14 (quoting AR 1248).[12]  Therefore, § 312.C does

not independently establish a remittance advice requirement.

Finally, the Court also cannot conclude that the plain language of § 322 imposes a

remittance advice requirement.  Again, like the other two provisions, § 322 does not explicitly

impose any such requirement.  The relevant language of § 322 provides as follows:

> In some instances, the State has an obligation to pay, but either does not pay
> anything or pays only part of the deductible or coinsurance because of a State
> payment "ceiling." . . . In these situations, any portion of the deductible or
> coinsurance that the State does not pay that remains unpaid by the patient, can be
> included as a bad debt under Medicare, provided that the requirements of § 312 are
> met.

PRM § 322.  The Court is not persuaded by the Administrator's conclusion that § 322's

reference to the amount that the State "does not pay," id., "presumes that the State has been

billed as all responsible parties are expected to be billed," AR 8.  Notably, the Administrator

does not conclude that this language presumes that a state has denied payment, and in any event,

the plain language of this provision does not reference a remittance advice or any other

documentation reflecting a state's response and does not make apparent that any such

documentation is required for Medicare reimbursement.  Thus, § 322 does not independently

establish a remittance advice requirement.

Finally, the Court is not persuaded by the Administrator's position that "[r]eading the[se]

sections together" establishes a remittance advice requirement.  AR 14.  Because the Court has

concluded that none of these provisions independently establishes a remittance advice

---

[12] The Court cites PRM § 1102.3L only to illustrate that the Administrator's conclusion is based on a flawed assumption, and it does not cite the provision as evidence that the Secretary's must-bill policy did or did not exist prior to the Moratorium.  As explained in Part III.A.4, infra, because this provision was not "in effect" before August 1, 1987, it is not part of the Secretary's pre-1987 policy, OBRA, Pub. L. No. 100–203, § 4008(c), 101 Stat. 1330, 1330–55 (codified at 42 U.S.C. § 1395f note), and any statements of policy contained within the provision are at best "a retrospective characterization of the Secretary's pre-Moratorium policy" and "do[] not illustrate how [the policy] was actually applied prior to 1987," Mountain States Health All., 128 F. Supp. 3d at 218.

requirement, or even refers to one, it cannot discern any reason to conclude that viewing these provisions together somehow creates that requirement. Thus, the Court concludes that PRM §§ 310, 312, and 322 do not demonstrate that a remittance advice requirement existed prior to the Moratorium.

The Secretary's additional counterarguments regarding these PRM provisions are also not persuasive. Specifically, the Secretary argues that "whether or not there might be another plausible interpretation of agency guidance, the Court must defer to the Secretary's interpretation unless it is plainly erroneous." Def.'s Objs. Resp. at 6. He further argues that a number of courts, including this Circuit, "ha[ve] concluded[] [that] the must-bill policy is a reasonable interpretation of a validly promulgated regulation." Def.'s Summ. J. Mem. at 14 (first citing Grossmont Hosp. Corp., 797 F.3d at 1085–86; then citing Me. Med. Ctr. v. Burwell, 775 F.3d 470, 479 (1st Cir. 2015); then citing Cmty. Hosp. of Monterey Peninsula, 323 F.3d at 792–93; then citing Cove Assocs. Joint Venture, 848 F. Supp. 2d at 25; and then citing GCI Health Care Ctrs., Inc. v. Thompson, 209 F. Supp. 2d 63, 71 (D.D.C. 2002)). However, as another member of this Court has explained,

> courts typically give substantial deference to an agency's interpretation of its own regulations[;] . . . [however, t]he Bad Debt Moratorium complicates the deference issue, [ ] as it requires the Court to follow the agency's 1987 interpretation of its own regulations, rather than the agency's present-day interpretation of the same. Under the Moratorium, an otherwise "reasonable" interpretation of a bad-debt regulation, if inconsistent with the Secretary's pre-1987 policy, is no longer so. And to defer to the Secretary's arguments now about what the agency's policy was then, rather than discerning such policy from the pronouncements of the agency at that time, would have the effect of thwarting the Moratorium's central "freezing" purpose altogether.

Winder HMA LLC, 206 F. Supp. 3d at 36–37 (internal citations and quotation marks omitted).[13]

---

[13] For the reasons explained in Winder, the Court respectfully disagrees with other members of this Court who have found that "the reasonableness of the agency's interpretation of its own regulation [and guidance,] and the level of

(continued . . . )

Therefore, the conclusions of this Circuit, other members of this Court, and other courts that a remittance advice requirement is a reasonable interpretation of the bad debt regulations or the relevant PRM provisions is not determinative here. This is so because, as the plaintiffs note, "none of [these cases] dealt with the Moratorium and none . . . found as a factual matter that the must[-]bill policy was established by th[e] PRM provisions." Pls.' Objs. at 9. And, none of these decisions concluded that the Administrator's interpretation of the bad debt regulations or the PRM provisions to require a remittance advice is the <u>only</u> interpretation of the PRM. <u>See, e.g.</u>, <u>Grossmont Hosp.</u>, 797 F.3d at 1082, 1085–86 (not analyzing the PRM provisions, but holding that the agency's interpretation of the bad debt regulation to require a provider to "obtain[] a determination from the state of its payment responsibility" "[wa]s sensible . . . because state policies vary widely and the state will have all of the necessary information under its Medicaid system," and "[t]here [wa]s no indication that the Secretary's interpretation [wa]s contrary to law or to the agency's intent at the time of the adoption"); <u>see also</u> <u>Me. Med. Ctr.</u>, 775 F.3d at 479 (concluding that "the [b]illing [r]equirement is a natural interpretation of the[] regulations"); <u>Cmty. Hosp. of Monterey Peninsula</u>, 323 F.3d at 793 ("Given that billing the state is the most straightforward and reliable way of determining whether, and, if so, how much the state will pay, we are unable to say that the must-bill policy is inconsistent with the statute or regulations or is an unreasonable interpretation of them"); <u>Cove Assocs. Joint Venture</u>, 848 F. Supp. 2d at 25 (concluding that "PRM §§ 310, 312, and 322 are reasonably read to require that

---

( . . . continued)

deference due to that interpretation," may "support[] the [Administrator's] conclusion that the agency's policy regarding bad debt reimbursement was the same on August 1, 1987 as it is now." <u>Cmty. Health Sys., Inc.</u>, 113 F. Supp. 3d at 221 ("Th[e] Court finds [ ] the agency's interpretation of a longstanding regulation to be no less reasonable because its current interpretation is the same as it <u>would have given</u>, if asked, prior to the effective date of the Moratorium." (emphasis added)); <u>see</u> <u>Lakeland Reg'l Health Sys.</u>, 958 F. Supp. 2d at 8 (concluding that because the Administrator's decision was "based on an interpretation of an agency regulation, . . . [it] is entitled to great deference").

the state be billed," which "is consistent with the Medicare statute and regulations[] and is not an unreasonable implementation of either"); GCI Health Care Ctrs., Inc., 209 F. Supp. 2d at 71 (concluding "that the reasoning contained within the Secretary's interpretation of . . . PRM §§ 310, 312[] is both valid and sound").  Indeed, at least two of these cases acknowledge that the PRM provisions are ambiguous.  See Cmty. Hosp. of Monterey Peninsula, 323 F.3d at 793, 796 (observing that "[i]t may be true[] . . . that the[] regulations can be read as not precluding the possibility of a provider's establishing the [bad debt] criteria . . . by alternative means," and that "[a]t most, the[] [PRM] provisions are ambiguous"); see also Cove Assocs., 848 F. Supp. 2d at 25 ("At most, the[] PRM provisions are ambiguous[.]" (citing Cmty. Hosp. of Monterey Peninsula, 323 F.3d at 796)).

For all of these reasons, the Court cannot conclude that the PRM provisions support the Administrator's finding that a remittance advice requirement existed prior to August 1, 1987.  As another member of this Court observed, the Administrator "is confusing the [PRM provisions] with his agency's interpretations of [the PRM provisions]."  Foothill Hosp., 558 F. Supp. 2d at 10.  Therefore, the Court must look to other evidence in the record to determine whether the Administrator's finding that a remittance advice requirement existed prior to August 1, 1987 may be upheld.

### 3.    Pre-Moratorium Board Decisions

The Administrator cited two Board decisions issued prior to the Moratorium—Concourse Nursing Home v. Travellers Insurance Co., PRRB Dec. No. 83-D152 (Sept. 27, 1983); and St. Joseph Hospital v. Blue Cross & Blue Shield Association, PRRB Dec. No. 84-D109 (Apr. 16, 1984)—as support for his position that the Secretary's must-bill policy, including the remittance advice requirement, "has been consistently articulated in the final decisions of the Secretary

addressing this issue . . . and applied to [ ] cost years prior to August 1, 1987." AR 14 & n.16.

Like the Administrator, the Magistrate Judge concluded that these decisions constitute "evidence

of the Secretary's consistent implementation of the must-bill policy since 1983." R&R at 12.

The plaintiffs raise a number of objections to these decisions, including that "CMS

administrative decisions do not and cannot set policy for the Secretary," Pls.' Objs. Reply at 9,

and that "non-ceiling case [ ] decisions related to the need to bill the State when the State was the

responsible payor[,] . . . have no bearing on whether there is a must[-]bill policy by which a

provider must bill [and receive a remittance advice from] the State when the provider otherwise

determines or demonstrates the State is not the responsible payor," id. at 7–8 (internal citation

omitted).   For the reasons explained below, the Court concludes that neither of these decisions

supports the Administrator's finding that, prior to August 1, 1987, the Secretary interpreted his

regulations or PRM provisions to require providers to obtain and submit a remittance advice in

order to receive Medicare reimbursement.   Consequently, the Court need not address each of the

plaintiffs' remaining arguments regarding these decisions.[14]

In Concourse Nursing Home, a provider sought Medicare reimbursement for unpaid

deductible and coinsurance payments that it contended were "owed by the [state] Medicaid

program." AR 1538.  The provider represented to the Board that prior to seeking Medicare

reimbursement for these amounts, it had made "formal appeals and [had] informal discussions

with appropriate state officials," which it argued were "reasonable" efforts given that the state

"had repeatedly refused to pay the[] claims until recently."  Id. (contending that "any further

collection efforts would be futile").  The intermediary disagreed and disallowed the claims,

---

[14] Because the Court concludes that these administrative decisions do not support a remittance advice requirement, and because it need not decide whether they support a billing requirement for the reasons explained in Part III.B, infra, the Court need not address the plaintiffs' remaining arguments as to these Board decisions.

concluding that "the provider ha[d] not met the [bad debt] requirements of 42 C.F.R.

[§] 405.420(e)"[15] because, inter alia, it "ha[d] not demonstrated that a reasonable collection

effort was made before the debts were deemed to be worthless."  Id.  The Board affirmed the

intermediary's decision, providing the following brief analysis:

> The Board finds that the provider has furnished no documentation which would support its contentions that it had established collection policies and procedures or that actual collection efforts were made to obtain payments from the patients or the Medicaid authorities before an account balance was considered an uncollectible bad debt for Medicare purposes.  The Board also notes that payments have been received for the bad debts claimed by the provider, which would also demonstrate that the amounts claimed were not properly chargeable to the Medicare program.

AR 1544.

In St. Joseph Hospital, decided approximately six months later, the Board again

considered a provider's claims for Medicare reimbursement for unpaid deductible and

coinsurance payments associated with dual eligible patients.  See AR 1549.  In that case, the

intermediary had also disallowed the provider's claims "based upon its determination that the

provider had not made reasonable collection efforts for the[] [ ] accounts."  AR 1550.

Specifically, as to the provider's Medicare reimbursement claims for Medicaid patients, the

intermediary had concluded that because "[t]he State of Georgia . . . will pay for the deductible

and coinsurance amounts applied to a charge for service allowed by Medicare regulations[,] [ ]

reasonable collection efforts related to Medicare bad debts should have included action to collect

amounts owed by . . . [the] State of Georgia," but "[t]he provider ha[d] not demonstrated that

such action took place."  Id.  In affirming the intermediary's disallowance, the Board

> conclude[d] that the bad debts claimed did not meet the regulatory requirements of [42 C.F.R. §] 405.420(e) because the provider could not support its claims that: they related to covered services and derived from deductibles and coinsurance; reasonable collection efforts were made; all accounts were not collectible; and there

---

[15] 42 C.F.R. § 405.420 was ultimately re-codified as 42 C.F.R. § 413.89.  See Dist. Hosp. Partners, 932 F. Supp. 2d at 200 n.7.

was no likelihood of future recovery. While the number of in-house billings was consistent for all parties, the provider did not attempt to bill the State of Georgia for its Medicaid patients. [Therefore, t]he provider's collection efforts were more token than genuine.

AR 1550–51.

These cases do not demonstrate that the Secretary interpreted his regulations or the PRM provisions as requiring a remittance advice as a prerequisite for reimbursement of unpaid deductibles and coinsurance associated with dual eligible patients. Notably, the Secretary himself does not claim that either decision demonstrates such a requirement. See Def.'s Summ. J. Mem. at 16–17 (asserting only that these two cases support a "billing requirement"). Indeed, neither decision refers to a remittance advice or any other documentation of the state's response to a claim, let alone a requirement that providers must obtain from the state and submit such documentation in order to receive Medicare reimbursement. Although the Board in Concourse Nursing Home suggested that a provider must "furnish[] [ ] documentation . . . [to] support . . . that actual collection efforts were made to obtain payments from the patients or the Medicaid authorities," AR 1544, it does not specify what documentation is required or assert that a provider must demonstrate that a state Medicaid program has denied payment in order to receive Medicare reimbursement for deductibles and coinsurance associated with dual eligible patients.

Additionally, even assuming that these cases support a billing requirement (which the Court does not decide for the reasons explained in Part III.B, infra), these cases would still fall short of supporting a remittance advice requirement. Although receiving a remittance advice or other determination of liability from the state may be a natural consequence of billing the state in many cases, and thus, the two requirements are logically related, as the plaintiffs' experience in this case demonstrates, a provider may not always receive a remittance advice in response to a bill submitted to the state. See AR 12. In any event, any causal relationship between the billing

and remittance advice requirements would not compel the Court to presume the existence of a remittance advice requirement solely from the existence of a billing requirement. As the Administrator and this Circuit have recognized, the two requirements are analytically distinct. See AR 2 ("The issue is whether the [p]roviders were required to bill the State Medicaid program and submit a State remittance advice . . . to the Medicare [intermediary] as a precondition for the Medicare program to pay bad debts[.]" (emphasis added)); see also Grossmont Hosp. Corp., 797 F.3d at 1086 ("The must[-]bill policy encompasses two requirements[:] a requirement to bill the state . . . for the bad debt claims as well as a requirement to obtain the state's determination as to its financial responsibility on those claims." (emphasis added)). And, as this Circuit has recognized, "[s]ubstantial evidence . . . must do more than create a suspicion of the existence of the fact to be established." Morall v. DEA, 412 F.3d 165, 176 (D.C. Cir. 2005). Therefore, neither of these decisions supports the Administrator's finding that a remittance advice requirement existed prior to August 1, 1987.

### 4. Post-Moratorium Administrator Decisions

In addition to the evidence already discussed, the Administrator relied on two administrative decisions issued after August 1, 1987, as support for his finding that the Secretary's must-bill policy, including a remittance advice requirement, existed prior to that date. See AR 14 n.16 (first citing Cal. Hosps. 90-91 Outpatient Crossover Bad Debts Grp. Appeal, PRRB Dec. No. 2000-D80 (Oct. 31, 2000); then citing Hosp. de Area de Carolina, Admin. Dec. No. 93-D23). The plaintiffs argue that "the Secretary cannot cite [ ] post-Moratorium administrator decision[s] for evidence of a pre-Moratorium policy." Pls.' Objs. Reply at 7. The Court agrees that these decisions do not support the Administrator's finding that a remittance advice requirement existed prior to August 1, 1987.

First, neither of these decisions recognizes a remittance advice requirement. Rather, they only purport to recognize and apply a billing requirement. See AR 1570 (concluding in California Hospitals 90-91 that "in order to be reimbursed [for] Medicare bad debts where a State has a ceiling, the provider is required to bill the State," and denying the providers' claims for reimbursement because "[t]he [p]roviders did not bill the State"); AR 1556–57 (recognizing in Hospital de Area de Carolina the provider's "obligation [to] submit[] claims to the [ ] Medicaid program" and concluding that because "the [p]rovider failed to request payment from the Commonwealth for deductibles and coinsurance amounts attributable to Medicare/Medicaid patients for which the Commonwealth was obligated to pay, those amounts are not properly included as bad debts").[16] And, even if these decisions had recognized a remittance advice requirement, because neither decision was issued until long after August 1, 1987—Hospital de Area de Carolina in 1993, see AR 1553, and California Hospitals 90-91 in 2000, see AR 1565—neither represents the Secretary's policy "in effect" as of that date, OBRA, Pub. L. No. 100–203, § 4008(c), 101 Stat. 1330 (codified at 42 U.S.C. § 1395f note); see also Winder HMA LLC, 206 F. Supp. 3d at 37 (explaining that "'[t]he Secretary's current interpretation of [Medicare] rules and guidelines is not determinative' as to whether the present interpretation was consistent with the pre-1987 policy of the Secretary" (quoting Detroit Receiving Hosp. v. Shalala, No. 98-1429, 1999 WL 970277, at *7 (6th Cir. Oct. 15, 1999)).

Moreover, although both decisions suggest that a billing requirement existed prior to the Moratorium by citing two pre-1987 decisions as a source for that requirement, those decisions

---

[16] Although the Administrator in Hospital de Area de Carolina noted that "the [p]rovider was never denied reimbursement by the Commonwealth's Medicaid program under a ceiling limitation or [o]n any other basis," AR 1556, he made no mention of a remittance advice requirement or any other requirement to produce documentation from the state Medicaid program. Moreover, the Administrator only recognized and applied an "obligation [to] submit[] claims to the [ ] Medicaid program," AR 1556; see also AR 1557 (rejecting the provider's claims because the provider "failed to request payment from the Commonwealth"), and did not purport to recognize or apply any requirement that a provider also be denied reimbursement, see AR 1556–57.

are St. Joseph Hospital and Concourse Nursing Home, see AR 1557 & n.7; AR 1571 & n.16 (asserting that "the final decisions of the Secretary have consistently held that the bad debt regulation and 42 C.F.R. [§] 413.20 require providers to bill the Medicaid programs for payment"), which, as already explained, do not support a remittance advice requirement. In any event, post-Moratorium statements about what the Secretary's pre-1987 policy required are "simply a retrospective characterization of the Secretary's pre-Moratorium policy" and "do not illustrate how [the policy] was actually applied prior to 1987." Mountain States Health All., 128 F. Supp. 3d at 218; see Winder HMA LLC, 206 F. Supp. 3d at 37 ("The question facing the Court [ ] is whether the Secretary's current understanding of the regulation[s] and the [PRM] is consistent with the agency's understanding of those materials in 1987, . . . [which] requires recourse to the [Board] decisions that predate the Moratorium and reflect the agency's position at that time."); Dist. Hosp. Partners, 932 F. Supp. 2d at 204 (finding that the Secretary's decision was not supported by various administrative decisions, in part because those decisions "postdate[d] the Moratorium by several years"). Thus, neither of these decisions supports the Administrator's finding that a remittance advice requirement existed prior to August 1, 1987.[17]

### 5. 1985 Intermediary Manual

The Magistrate Judge concluded that language from a 1985 Intermediary Manual cited in the Secretary's opening brief "is further evidence of the must-bill policy," including a remittance advice requirement. R&R at 18. In reaching this conclusion, the Magistrate Judge rejected the plaintiffs' argument that consideration of this evidence, which was not cited in the

---

[17] The Secretary argues that Hospital de Area de Carolina, although issued after the Moratorium, is nonetheless relevant because it "applied the Secretary's pre-1987 policy [given that] the cost reporting periods at issue [in that case] were 1985 and 1986." Def.'s Summ. J. Reply at 6 n.4. However, the Court need not resolve this issue because, even if it concluded that Hospital de Area de Carolina should be considered, for the reasons already explained, the Court would find that the Administrator's decision in that case does not support the existence of a remittance advice requirement prior to August 1, 1987.

Administrator's decision, "represent[ed a] 'post-hoc rationalization by agency counsel,'" id. at 17 (quoting Pls.' Summ. J. Reply at 10), reasoning that the Secretary's "additional citation to the . . . [1985 Intermediary Manual]" merely constituted a "more detailed explanation" of the Administrator's decision of the type that may be considered by the Court, id. The plaintiffs argue that the Magistrate Judge's consideration of this evidence was "improper" because it is "extra-record evidence" that cannot be used to "prove the existence of a policy that pre-dated the Moratorium." Pls.' Objs. at 13–14. The Secretary responds that "[t]he Magistrate [Judge] correctly followed the D.C. Circuit's conclusion in the very context of the must-bill policy that '[c]ourts can accept a more detailed explanation that does not present a new basis for the agency's action.'" Def.'s Objs. Resp. at 7 (first quoting Grossmont Hosp. Corp. v. Sebelius, 903 F. Supp. 2d 39, 58 n.10 (D.D.C. 2012); then citing Clifford v. Pena, 77 F.3d 1414, 1418 (D.C. Cir. 1996)).

The Court agrees with the plaintiffs that the 1985 Intermediary Manual provision cited by the Secretary may not be considered. It is well-established that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); see also Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984) ("Review [of the Secretary's decision] is to be based on the [ ] administrative record that was before the Secretary at the time he made his decision." (emphasis added) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971))). The Administrator did not cite or refer to the 1985 Intermediary Manual provision in his decision, see generally AR 2–18, and the Secretary does not argue that the provision was in the record before the Administrator, see generally Def.'s Objs. Resp. Therefore, under the general rule applicable to this Court's review of agency action,

the Court may not consider the 1985 Intermediary Manual provision. See Dist. Hosp. Partners, 932 F. Supp. 2d at 203 (in the Moratorium context, rejecting "the Secretary's attempts in her [m]otion for [s]ummary [j]udgment to 'bolster' the weight" of evidence "by referencing a . . . [CMS m]emorandum" because it "was not included in the [a]dministrative [r]ecord and therefore need not be considered"); see also Ctr. for Auto Safety v. Fed. Highway Admin., 956 F.2d 309, 314 (D.C. Cir. 1992) (concluding that because evidence cited by the agency had been "exclude[d] . . . at the administrative stage, the [agency] c[ould ]not [ ] rely on th[e] [evidence] to provide the requisite evidentiary support during judicial review"); Algonquin Gas Transmission Co. v. Fed. Energy Regulatory Comm'n, 948 F.2d 1305, 1316 (D.C. Cir. 1991) ("declin[ing] to rely on evidence as a ground for affirming the [Commission's] order" where that "evidence was nowhere considered in either of the Commission's orders below").

The cases cited by the Secretary and the Magistrate Judge do not provide the Secretary any relief from this general rule. The Grossmont Hospital decision provides no support for the Secretary's position, as the district court simply found it appropriate to consider "further explanation . . . [provided by the Secretary] during the course of litigation," 903 F. Supp. 2d at 58 n.10, where that explanation was based on evidence contained in the administrative record, see id. at 58 (recognizing that the Secretary's "further explanation" was based on the provider's testimony before the Board).[18] Therefore, the district court did not assess whether a court may consider additional evidence not included in the administrative record, and, if anything, this

_____

[18] The Court is perplexed by the Secretary's citation to a district court case to support his reference to "the D.C. Circuit's conclusion in the very context of the must-bill policy." Def.'s Objs. Resp. at 7 (emphasis added) (citing Grossmont Hosp., 903 F. Supp. 2d at 58 n.10). In any event, although the district court in Grossmont Hospital did consider a provider's challenge to the must-bill policy, the conclusion cited by the Secretary did not appear in the context of the Court's consideration of that challenge, but instead appeared in the context of the provider's challenge to the Secretary's finding that the provider did not qualify for hold harmless relief under JSM-370. See Grossmont Hosp., 903 F. Supp. 2d at 58. Therefore, the Secretary's suggestion that the conclusion in Grossmont Hospital is somehow supportive or factually on point is meritless.

decision undermines the Secretary's position because it underscores that the administrative record must be "the focal point" of the Court's review. See Camp, 411 U.S. at 142. The Circuit's decision in Clifford v. Pena is likewise unavailing for the Secretary, as the Circuit there concluded only that the district court could consider a declaration from an agency official that "merely illuminate[d] reasons obscured but implicit in the administrative record." 77 F.3d at 1418 (rejecting the plaintiff's argument that the district court improperly permitted the agency to supplement the record with a declaration from an agency official that "provide[d] the court with background information about the [agency's] subsidy program and the current state of the American shipping industry" (quoting Seafarers Int'l Union v. United States, 891 F. Supp. 641, 647 (D.D.C. 1995))). As to the 1985 Intermediary Manual provision at issue here, first, it is not a declaration of an agency official, and second, the provision is not offered to "merely illuminate reasons obscured but implicit in the administrative record," id., but is instead offered to "bolster the weight" of the evidence cited by the Administrator as support for his position, Dist. Hosp. Partners, 932 F. Supp. 2d at 203, which the court cannot condone. Therefore, the Court concludes that neither of the decisions cited by the Secretary provides support for his position that the 1985 Intermediary Manual provision may be considered notwithstanding its absence from the administrative record.

### 6.     Statements by CMS Officials

The plaintiffs contend that the Magistrate Judge erred by "not giv[ing] any weight to unchallenged testimony" offered by the plaintiffs at the Board hearing regarding statements allegedly made by senior CMS officials "that there was no must[-]bill policy prior to 1987." Pls.' Objs. at 16. However, the CMS officials' statements were allegedly made at a meeting held in December 1993. See Pls.' Summ. J. Mem. at 27. Given the plaintiffs' position that the

Secretary may not "rely[] on post-Moratorium materials," Pls.' Objs. at 5, including statements made on behalf of the Secretary in "post-Moratorium Administrator decision[s]," id. at 11 n.9, the Court is perplexed as to why the plaintiffs insist that the Court should consider post-Moratorium statements by CMS officials. The plaintiffs "cannot have it both ways." Winder HMA LLC, 206 F. Supp. 3d at 38. These statements, like the post-Moratorium administrative decisions, are "simply a retrospective characterization of the Secretary's pre-Moratorium policy" and "do[] not illustrate how [the policy] was actually applied prior to 1987." Mountain States Health All., 128 F. Supp. 3d at 218. Therefore, the Court adopts the Magistrate Judge's refusal to consider the CMS officials' statements.

### 7. Other Legal Authority and Evidence

The Administrator cited a number of other legal authorities and record evidence to support his conclusion that the must-bill policy, including the remittance advice requirement, predated the Moratorium. However, for the reasons explained below, the Court finds this remaining evidence also unavailing.

First, the Administrator appeared to rely on language in the regulation setting forth the Secretary's bad debt criteria, see 42 C.F.R. § 413.89, as evidence of the must-bill policy, including the remittance advice requirement. Specifically, he asserted that the policy is reflected in § 413.89(d)(1), which provides that "the costs of Medicare deductible and coinsurance amounts, which remain unpaid (i.e., were billed) may be included in allowable costs," AR 13, and also § 413.89(e), which "requires . . . [that] a provider [must] establish that a reasonable collection effort from the responsible party (i.e.[,] the State) was made and that the debt was actually uncollectible when claimed," id. And, regarding the "uncollectible" requirement of § 413.89(e), he asserted that "[a] fundamental requirement to demonstrate that an amount is, in

fact, unpaid and uncollectible, is to bill the responsible party." Id. However, none of the provisions cited by the Administrator refers to a remittance advice or the receipt of any other documentation from the state. Rather, § 413.89(d) and (e) are silent as to what constitutes a "reasonable collection effort" or what a provider must do to demonstrate that a debt was "uncollectible" when claimed. See 42 C.F.R. § 413.89(d)–(e). Thus, the Administrator "is confusing the regulation with his agency's interpretations of the regulation." Foothill Hosp., 558 F. Supp. 2d at 10. Consequently, the bad debt regulation itself does not demonstrate that a remittance advice requirement existed prior to August 1, 1987.

Additionally, the Administrator concluded that "preservation of the remittance advice is an essential and required record keeping criteria for Medicare reimbursement since the beginning of the program," AR 15, as recognized by "the general record keeping rules of Section 1815(a) [of the Medicare Act] and 42 C.F.R. [§§] 41[3].20 and 41[3].24 requiring contemporaneous auditable documentation kept in the normal course of business to support a claim for payment," AR 8. However, these cited authorities do not state that a provider must obtain a remittance advice or other state documentation. Although § 1815(a) purports to authorize the Secretary to impose requirements on providers seeking Medicare reimbursement, it does not demonstrate that the Secretary in fact imposed a remittance advice requirement prior to the Moratorium or, for that matter, at any time. See 42 U.S.C. § 1395g(a) (providing that "no [ ] payment [to a provider] shall be made . . . unless [a provider] has furnished such information as the Secretary may request in order to determine the amounts due such provider"). Likewise, assuming that the cited regulations require providers to support their claims for Medicare reimbursement of bad debts with "contemporaneous documentation in the ordinary course of business to support their claims," AR 17, they do not state that remittance advices are the only documentation that would

satisfy such a requirement, see 42 C.F.R. § 413.20(a) (requiring, inter alia, that "providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program," and that providers follow "[s]tandardized . . . reporting practices that are widely accepted in the hospital and related fields"); see also id. § 413.24(a)–(b) (requiring that "[p]roviders receiving payment on the basis of reimbursable cost must provide adequate cost data," which "must be based on their financial and statistical records . . . [and] capable of verification[,] . . . based on an approved method of cost finding and on the accrual basis of accounting," and "derived from the accounts ordinarily kept by a provider"). Again, the Administrator "is confusing [these laws] with his agency's interpretations of [these laws]." Foothill Hosp., 558 F. Supp. 2d at 10.

The Administrator also asserted that § 1903(r)(1) of the Medicare Act provides further support for a remittance advice requirement because it "requires automated facilitation of cross-over claims between State Medicaid programs and the Medicare program for dual eligible patients," and thus, it "recognize[s]" the "necessity" that "[i]t is only through the State's records and claims system that the amount of any payment can be determined." AR 13. However, once again, this provision on its face does not require that a provider must receive a remittance advice from the state in order to receive Medicare reimbursement. See 42 U.S.C. § 1396b(r)(1) (providing that "a State must[] . . . have in operation mechanized claims processing and information retrieval systems" that, inter alia, "provide for electronic transmission of claims data[,] . . . including[] . . . data elements from the automated data system").

Finally, the Administrator cited JSM-370 as support for his position that the must-bill policy, including the remittance advice requirement, existed prior to August 1, 1987, see AR 8 ("[]JSM-370[] restated Medicare's longstanding bad debt policy[.]"), as well as "letters from

three [fiscal i]ntermediaries setting forth the must-bill policy," AR 14 n.16. Although JSM-370 does state that a remittance advice is required in certain dual eligible situations, <u>see</u> AR 1607 ("[W]here the state owes none or only a portion of [a] dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance Advice)."), it was not issued until August 10, 2004, <u>see</u> AR 1607. Similarly, although the letters from the intermediaries reflect their opinions that providers must bill Medi-Cal and receive a denial of payment in order to receive Medicare reimbursement for dual eligible payments, each letter is dated in November or December of 1989, <u>see</u> AR 604, 610, 612, two years after August 1, 1987, and only purports to opine on whether these requirements existed as of those dates. Therefore, these letters are at best "a retrospective characterization of the Secretary's pre-Moratorium policy," and they "do[] not illustrate how [the policy] was actually applied prior to 1987." <u>Mountain States Health All.</u>, 128 F. Supp. 3d at 218.

In sum, the Court concludes that because the relevant statutory provisions, regulations, and PRM provisions do not on their face require a provider to obtain and submit a remittance advice from the state Medicaid program as a prerequisite for Medicare reimbursement of unpaid deductibles and coinsurance associated with dual eligibles, those authorities do not support a finding that the Secretary imposed such a requirement prior to August 1, 1987. Moreover, the two pre-1987 Board decisions cited do not demonstrate that the Secretary interpreted those authorities to require a remittance advice. Finally, the administrative decisions issued after the Moratorium and alleged statements by CMS officials or intermediaries made after the Moratorium do not constitute the Secretary's pre-1987 policy and "do not illustrate how [the policy] was actually applied prior to 1987." <u>Mountain States Health All.</u>, 128 F. Supp. 3d at 218.

For all of these reasons, the Court concludes that the Administrator's finding that a remittance advice requirement existed prior to the Moratorium is not supported by substantial evidence. Although substantial evidence review is "highly deferential," Rossello, 529 F.3d at 1185, in the absence of any evidence to support the Administrator's finding, the Court cannot conclude that there exists "such relevant evidence as a reasonable mind might accept as adequate to support" his finding, id. (quoting Pierce, 487 U.S. at 565). Consequently, in the absence of any evidence to support the existence of a pre-Moratorium remittance advice requirement, the Court concludes that the remittance advice requirement applied by the Administrator in this case is a "requirement[] in addition to those in the Secretary's regulations, the decisions of the . . . Board, and relevant program manual and issuances" as of August 1, 1987. HR Conf. Rep. No. 100–1104 (1988), as reprinted in 1988 U.S.C.C.A.N. 5048, 5337. As such, it represents a "change in the policy in effect on August 1, 1987," in violation of the Bad Debt Moratorium. See OBRA, Pub. L. No. 100–203, § 4008(c), 101 Stat. 1330 (codified at 42 U.S.C. § 1395f note); see also Dist. Hosp. Partners, 932 F. Supp. 2d at 206 (concluding that the challenged policy violated the Moratorium in part because "the Secretary ha[d] pointed to no persuasive evidence that supports her contention, much less pre-1987 evidence"); Foothill Hosp., 558 F. Supp. 2d at 10 (concluding that the challenged policy "constitute[d] a change in policy, . . . [because it] did not exist prior to the effective date of the Moratorium").

**B.    Alternative Grounds for the Administrator's Decision**

Having concluded that the Administrator's finding that a remittance advice requirement existed prior to the Moratorium is not supported by substantial evidence and that imposing the requirement in this case violated the Moratorium, the Court cannot affirm the Secretary's final decision on the grounds provided by the Administrator. As already explained, the Administrator

denied the plaintiffs' claims for reimbursement because "the [plaintiffs'] failure to produce [ ] Medicaid remittance advices represent[ed] a failure on the part of the [plaintiffs] to meet the necessary criteria for Medicare payment of bad debts related to these claims." AR 13. Although this Circuit recognized in <u>Grossmont Hospital</u> that a court may "affirm an agency decision on a ground other than that relied upon by the agency . . . 'when there is not the slightest uncertainty as to the outcome of a proceeding on remand,'" 797 F.3d at 1086 (quoting <u>Manin v. NTSB</u>, 627 F.3d 1239, 1243 (D.C. Cir. 2011)), the Court does not find it appropriate to do so here. In <u>Grossmont Hospital</u>, after concluding that the state determination requirement of the Secretary's must-bill policy was "sensible" and upholding the Secretary's denial of a provider's claims based on a failure to meet that requirement, the Circuit went on to "conclude that an independent basis for affirming the Secretary's disallowance of [the provider]'s claims [wa]s the failure of [the provider] to timely bill Medi–Cal for those claims." <u>Id.</u> Specifically, the Circuit found that "[a]lthough the Secretary relied only on the state determination requirement for her disposition, she stated that the record [ ] supports a conclusion that these claims were not in the States's system, that is, they were not billed." <u>Id.</u> (internal quotation marks omitted).

Here, unlike in <u>Grossmont Hospital</u>, the Court concludes that "there is . . . uncertainty as to the outcome of [this] proceeding on remand." <u>Id.</u> (quoting <u>Manin</u>, 627 F.3d at 1243). Although the Administrator in this case concluded that "the [plaintiffs] were required to bill . . . as a condition of including crossover bad debt claims on [their] cost report[s]," AR 13, he did not make any factual finding "that the record [ ] supports a conclusion that the[] claims [at issue] . . . were not billed," <u>Grossmont Hosp.</u>, 797 F.3d at 1086. To the contrary, the Administrator acknowledged that "[t]he p[laintiffs] testified [at the Board hearing] that they billed for some of the dual eligible patients." AR 12 n.13; <u>see</u> Pls.' Resp. to Court at 1 (representing that "some of

46

the inpatient claims at issue were billed" and "some of the outpatient claims at issue [likely] were billed").[19]  Thus, the Court cannot affirm the Administrator's decision by concluding that, on remand, the Administrator would again deny all of the plaintiffs' claims for reimbursement on the independent basis that the plaintiffs failed to bill the state for those claims.

Finally, there exists no other independent basis for affirming the Administrator's decision that would make the outcome on remand certain, at least not as to all of the plaintiffs' claims. Although it may be certain that the Administrator would again deny any claims that he found had not been billed on the ground that the plaintiffs would not qualify for an exception to the billing requirement under the terms set forth in § 1102.3L, see AR 15–16,[20] the Court cannot be certain as to the outcome of any of the claims that the Administrator may find were billed.  As to these claims, whether the plaintiffs qualify for relief under § 1102.3L or whether their documentation ultimately satisfies the requirements of that provision would not be dispositive because § 1102.3L merely creates an exception to billing.  See AR 1248 (addressing the documentation a provider must provide "in lieu of billing").  Moreover, the only other basis the Administrator provided for rejecting the plaintiffs' claims was that the alternative documentation the plaintiffs provided was not the equivalent of a remittance advice or any other official state documentation, see AR 18 (refusing to accept the plaintiffs' EDS reports because they "are not

---

[19] Although the Administrator asserted in one instance that "the [plaintiffs] ha[d] not submitted claims to the State," AR 15–16, he did not assert that the plaintiffs had not submitted any of the claims to Medi-Cal, and the Court does not interpret the Administrator's statement that way, given the Administrator's explicit recognition of the plaintiffs' specific testimony that "they billed for some of the dual eligible patients," AR 12 n.13.

[20] The Administrator specifically concluded that "any relief CMS grants based on a [p]rovider's reliance on section 1102.3L is set forth under criteria of the JSM[-370] 'hold harmless' policy[,] . . . [and] the [plaintiffs] did not demonstrate that they meet the criteria for the hold harmless provision set forth in JSM-370 for the cost years in this case."  AR 17.  And, the plaintiffs do not argue that they have satisfied these criteria.  See Motions Hrg. Tr. 57:25–58:1 (acknowledging that "hold harmless relief[] . . . is very narrow and [the plaintiffs are] not claiming [they are] entitled to it").

contemporaneously generated State documents" and "were not validated, certified or adopted as State documents and do not qualify as State remittance advices"), and because this basis for rejection of the plaintiffs' documentation necessarily relied on the remittance advice requirement that the Court has already rejected, absent further development of the record, the Administrator may not again apply this requirement.[21]

Therefore, the Court cannot conclude that the fate of any claims the Administrator finds were billed would be certain on remand. Consequently, the Court must vacate the Administrator's decision and remand this case to the Secretary for further consideration of the plaintiffs' claims. See Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards."); see also Ne. Hosp. Corp. v. Sebelius, 699 F. Supp. 2d 81, 96 (D.D.C. 2010) (remanding to the Secretary for further consideration of her Medicare reimbursement determination rather than instructing the Secretary as to how the reimbursement should be calculated because "the Court 'ha[s] jurisdiction only to vacate the Secretary's

_____

[21] Although the Administrator suggested that the plaintiffs' documentation also failed to satisfy 42 C.F.R. § 413.26(a)'s requirement that providers submit "documentation reflecting 'data available from [a provider's] basic accounts, as usually maintained,'" AR 16 (quoting 42 C.F.R. § 413.26(a)), he appeared to take the position that only a remittance advice could satisfy that requirement, see AR 16–17 (concluding that "the [p]roviders ha[d] not maintained 'contemporaneous documentation in the ordinary course of business to support their claims[,]' which in fact[] the State remittance advices represent"). Because that position effectively imposes a remittance advice requirement, which the Court has rejected, it also could not provide a basis for the Administrator's denial of the claims on remand. To the extent that the Secretary argues that the Court may affirm the Administrator's decision on the ground that the plaintiffs' documentation fails to satisfy § 413.26(a) for other reasons, see Motions Hrg. Tr. 33:9–34:8 (arguing that the plaintiffs' 2007 EDS reports failed to satisfy a "contemporaneous requirement" because they were "not . . . contemporaneous with the cost reporting periods" and "stale," and therefore, "[i]t[] [is] hard to know whether that information would even be accurate"), the Administrator's decision does not purport to rely on those reasons and therefore, the Secretary's position constitutes a post-hoc rationalization that cannot support the Administrator's decision, see Summer Hill Nursing Home, 603 F. Supp. 2d at 39. Alternatively, because the Secretary did not argue this position in his briefings before the Magistrate Judge, the Court need not consider it. See Aikens, 956 F. Supp. at 19 (explaining that Federal Rule of Civil Procedure 72(b) "does not permit a litigant to present new initiatives to the district judge").

decision . . . and to remand for further action consistent with its opinion,' and it would be error to do anything more" (alteration and omission in original) (quoting Palisades Gen. Hosp., 426 F.3d at 403)).  Although the plaintiffs raise a number of other challenges to the Administrator's decision, including that (1) the Secretary's billing requirement violated the Moratorium, see Pls.' Objs. at 3; (2) the Secretary erred in failing to apply PRM § 1102.3L to the plaintiffs' claims, see id. at 17 ("PRM [§] 1102.3L . . . must be given legal effect[.]"); and (3) "the Secretary's decision denying the [p]laintiffs' claims for reimbursement was arbitrary and capricious," id. at 2, "[b]ecause the Court concludes that remand is appropriate, it need not reach these arguments," Mountain States Health All., 128 F. Supp. 3d at 222 (remanding the case to the Secretary for further consideration of the plaintiff's claims and declining to consider the plaintiff's alternative argument upon concluding that the Secretary erred in finding that the challenged bad debt policy did not violate the Moratorium,); see Dist. Hosp. Partners, 932 F. Supp. 2d at 199 n.5 ("Because the Court concludes that the Administrator erred when she determined that there was no change in policy in violation of the . . . Moratorium, the Court need not address . . . whether the [Secretary's policy] is arbitrary and capricious.").

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the Administrator's finding that the Secretary's remittance advice requirement predated the Moratorium is not supported by substantial evidence, and thus, based on the administrative record before the Secretary, application of such a requirement to the plaintiffs' claims violated the Moratorium.  Accordingly, the Administrator erred when he concluded that the remittance advice requirement did not violate the Moratorium.  Therefore, the Court cannot affirm the Secretary's denial of the plaintiffs' claims on the basis that the plaintiffs failed to provide remittance advices to support

their claims.  Moreover, because the Administrator did not find that the plaintiffs failed to bill the state for all of the claims at issue, the Court cannot affirm the Administrator's decision denying all of the plaintiffs' claims on the alternative ground that the plaintiffs failed to satisfy any billing requirement.  Accordingly, the Court declines to adopt, except as otherwise indicated, the Magistrate Judge's recommendation, grants in part and denies in part the plaintiffs' motion for summary judgment, denies the defendant's cross-motion for summary judgment, and remands this case to the Secretary for further proceedings consistent with this opinion.[22]

      **SO ORDERED** this 29th day of September, 2018.

REGGIE B. WALTON
United States District Judge

---

[22] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.